# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

DORRINA J. OGBURN, )
                  Plaintiff, )
v. ) Case No. 10-CV-356-PJC
MICHAEL J. ASTRUE, Commissioner of the )
Social Security Administration, )
                  Defendant. )

## OPINION AND ORDER

Claimant, Dorrina J. Ogburn ("Ogburn"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Ogburn's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Ogburn appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Ogburn was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background[1]

Ogburn was 26 years old at the time of the hearing before the ALJ on February 11, 2008. (R.

---

[1] It is generally the practice of the undersigned to include a comprehensive review of all records included in the administrative transcript. In this case, the record contains more than 800 pages, and the undersigned has elected to summarize only records that are relevant beginning with Ogburn's psychiatric hospitalization in March 2005. The undersigned also finds it unnecessary to consider records that were not before the ALJ, but were submitted to the Appeals Council.

25). She testified that she had an eighth grade education and had never obtained a GED. *Id.* She said that she did not continue in school successfully after she witnessed her mother's boyfriend shoot and kill himself. (R. 25-26). Until that time, she attended special education classes. (R. 26). Ogburn's trouble in school was also caused by problems with drugs, and she testified that she had not used drugs since 2005. (R. 29).

Ogburn testified that she had not worked after her application date. (R. 27). She had worked sporadically in the past, and the longest she held a job was for about five months in 1998. *Id.* She testified that she got fired for not showing up for work, and she said her absence from work was caused by an inability to "be around a lot of people." (R. 27-28).

She testified that she could not work due to her anxiety, which made her scared to be around people. (R. 30). Her inability to learn things as quickly as other people also made her nervous. *Id.* She also had been diagnosed with hepatitis C about two-and-one-half years before the hearing. (R. 30-31). She believed she had pain, fatigue, and nausea due to the hepatitis. (R. 31-32). She had also been told that she was obese, and she weighed about 270 or 280 pounds at the time of the hearing. (R. 33-34). She testified that she had gained about 100 pounds in the time period from 2005 to the 2008 hearing due to her medications. (R. 34). Ogburn testified that many of her medications caused side effects such as making her sleepy. (R. 35-36).

Ogburn began having panic attacks two to three years before the time of the hearing, after she quit using methamphetamine. *Id.* Even with her medications, she continued to have anxiety, and she gave the example of when her 7-month-old baby was "crying a lot," she would have to go sit down. *Id.* She thought she was having an increased number of panic attacks, and she thought her doctors were going to increase her medications. (R. 37). She gave examples of different situations

in which she might have panic attacks. (R. 37-38). She testified that she never went to the store alone. (R. 38). If she had a panic attack while shopping, she would go out to the car, and the other person would finish the shopping. *Id.* A panic attack would last about 30 minutes to an hour. (R. 38-39). She thought she averaged about two or three panic attacks a week. (R. 39-40).

She was usually depressed. (R. 41). She didn't leave her house often, and she would only leave to go to the grocery store or to her mother's house. (R. 42). She didn't drive, and she didn't have a driver's license. *Id.*

Some days, she would get up and take care of her 7-month-old baby, but other days she wouldn't, and her fiancé would tend to the baby. (R. 42-43). She would sometimes stay in bed until noon. *Id.* When she got up, she would try to clean the house, do laundry, or cook a small meal. (R. 42-44). When she tried to do household chores, she rarely finished a task. (R. 44). Her sleep was disrupted at night due to nightmares. (R. 43). She would lie down often during the day because she was exhausted, tired, and drained. *Id.*

Ogburn testified that she could walk about three blocks slowly, and she would then "run out of breath" and her ankles would hurt. (R. 40). She thought she could stand about 20 minutes. (R. 40-41). She could sit for about 30 minutes. (R. 41).

Ogburn presented to Laureate Psychiatric Clinic and Hospital ("Laureate") on March 22, 2005 with suicidal ideation, plan, and intent. (R. 310-15). She was 23 years old and accompanied by her mother. (R. 310). The assessment notes state that Ogburn had attempted to run her car into a bridge less than a month earlier, and it was determined that she needed inpatient hospital care. *Id.* Because there was no available bed at Laureate, she was transferred to Brookhaven Hospital

("Brookhaven"). *Id.* At Laureate, Ogburn was given Axis I[2] diagnoses of bipolar I disorder, most recent episode depressed, severe without psychotic features; posttraumatic stress disorder ("PTSD"); polysubstance dependence; and panic disorder without agoraphobia. (R. 315). Her global assessment of functioning ("GAF")[3] was rated as 30, with a highest in the past year of 55. *Id.*

At Brookhaven Hospital, Ogburn's admission diagnoses included bipolar disorder, mixed episodes with rapid cycling tendencies, current phase depressed; PTSD; and history of polysubstance abuse. (R. 318). Her GAF was rated as 30. *Id.* Ogburn stayed at Brookhaven inpatient from March 22, 2005 until she was discharged on March 26. *Id.* Her discharge diagnosis was bipolar I disorder, and her GAF was rated as 55.

An intake interview at Family & Children's Services ("FCS") took place on March 28, 2005. (R. 636-43). The case manager stated Ogburn's GAF as 50 current and 55 highest in past year. (R. 640).

A comprehensive treatment plan was completed at FCS on June 29, 2005. (R. 381-86). On August 12 and 24, 2005, she saw a case worker. (R. 396-97). On September 6, 2005, she saw a doctor at FCS, and it appears that the assessments included bipolar mood disorder and PTSD. (R.

---

[2]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[3]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

401). The physician adjusted Ogburn's medications. *Id.* On September 13 and 20, 2005, Ogburn again saw a case manager. (R. 394-95).

On October 21, 2005, several forms were completed by Ogburn's case manager at FCS related to Medicaid and pharmaceutical payment programs. (R. 390-93). In October 2005, Ogburn reported to a staff psychiatrist that she had gained excessive weight, and she was discontinued from Seroquel. (R. 400). On November 17, 2005, Ogburn saw her case manager who wrote in her case notes that she "assisted [Ogburn] in filling out SSDI mental status form and had Dr. sign the form." (R. 387). A Mental Status Form dated November 21, 2005 bears the signature of a physician and of Ogburn's case manager at FCS. (R. 450). The hand-written notes on the form state that Ogburn "is able to remember, comprehend and carry out only simple instructions with assistance. [Ogburn is] unable to respond to work pressure." *Id.* The diagnosis is listed as bipolar I disorder, mixed. *Id.*

Ogburn saw her case manager at FCS in December 2005 and in January and March 2006. (R. 657-63).

A liver biopsy conducted on February 24, 2006 showed evidence of grade 1, stage 1, chronic hepatitis C. (R. 485).

Ogburn saw a psychiatrist at FCS on March 2, 2006, and he continued her medications. (R. 666). She also saw her case manager that same date, and an updated treatment plan was completed. (R. 644-55). Axis I diagnoses were bipolar I disorder most recent episode mixed, severe, without psychotic features; PTSD; and polysubstance dependence. (R. 653). Ogburn's GAF was stated as 50. (R. 655). Ogburn saw a psychiatrist on May 22, 2006, and he continued her medications. (R. 665). Ogburn saw her case manager on May 23, 2006. (R. 656).

Records from May through August 2006 show that Ogburn was referred by the OU Clinic

to Haresh K. Ajmera for treatment of her hepatitis C. (R. 542-50). On an intake questionnaire, Ogburn noted that she had a recent loss of 15 pounds in two months, she had occasional nausea and vomiting, she had two to three watery stools a day, and she had experienced pain in her abdomen all the time for 4-5 months prior to the intake. (R. 549).

Ogburn was seen at the emergency room of St. John Medical Center on August 26, 2006 for abdominal pain and rectal bleeding. (R. 566-69). The diagnosis was acute abdominal pain, possibly due to chemotherapy for hepatitis C. (R. 567).

Ogburn presented to Saint Francis emergency room on September 2, 2006 with abdominal pain. (R. 618-29). Imaging done on that date showed no significant radiographic abnormality of Ogburn's abdomen or pelvis. (R. 623).

Ogburn was seen at FCS by Terri Stonehocker, M.D. on July 18, 2007. (R. 819). Ogburn reported that she had given birth to her baby, and she wanted to resume taking medications that she had stopped during the pregnancy. *Id.* She was seen by Sarah Janes, D.O. on October 1, 2007, and diagnoses were bipolar, PTSD, and "polysubstance." (R. 822). Dr. Janes adjusted Ogburn's medications. *Id.*

Agency consultant William T. Bryant, Ph.D. conducted a mental status evaluation of Ogburn on January 26, 2006. (R. 492-95). Ogburn had difficulty with directions to the appointment, and she said that she didn't drive, but she had driven herself to the appointment. (R. 493). Dr. Bryant summarized the results of his examination, and he concluded that Ogburn's memory and her fund of information were both poor. (R. 493-95). He estimated that Ogburn's IQ was 73. (R. 495). He believed that she was not capable of managing her own funds "due to poor judgment, poor math skills, bipolar impulsive spending, and possible substance relapse." *Id.* Dr. Bryant did not think that

Ogburn was malingering, but he thought it was possible that she would use her symptoms to be manipulative. *Id.*

Agency nonexamining consultant Sally Varghese completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on March 9, 2009. (R. 497-515). For Listing 12.04, Dr. Varghese noted Ogburn's depressive, manic, and bipolar syndromes. (R. 500). For Listing 12.06, Dr. Varghese noted Ogburn's PTSD. (R. 502). For Listing 12.09, Dr. Varghese noted behavioral changes associated with the regular use of substances that affect the central nervous system. (R. 505). For the "Paragraph B Criteria,"[4] Dr. Varghese found that Ogburn had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 507). Dr. Varghese noted one or two episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Varghese noted Ogburn's psychiatric hospitalizations in 2005. (R. 509). She stated that Dr. Bryant's examination showed that Ogburn's memory was "fair." *Id.* She noted Ogburn's IQ in the borderline range and her PTSD, and she brief summarized Ogburn's activities of daily living. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Varghese found that Ogburn was moderately limited in her ability to understand and remember detailed instructions, and markedly limited in her ability to carry them out. (R. 511). Dr. Varghese also found Ogburn to be markedly limited in her ability to interact appropriately with the general public. (R. 512). She found

---

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

no other significant limitations. (R. 511-12). Dr. Varghese stated that Ogburn could perform simple tasks with routine supervision could "relate for work purposes," and would "have trouble relating well with the public." (R. 513).

**Procedural History**

Ogburn filed an application on September 13, 2005, seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 89-91). The application was denied initially and on reconsideration. (R. 55-61). A hearing before ALJ Lantz McClain was held February 11, 2008 in Tulsa, Oklahoma. (R. 21-49). By decision dated March 21, 2008, the ALJ found that Ogburn was not disabled at any time through the date of the decision. (R. 8-20). On April 1, 2008, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his

a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

At Step One, the ALJ found that Ogburn had not engaged in any substantial gainful activity since her application date of September 13, 2005. (R. 13). At Step Two, the ALJ found that Ogburn had severe impairments of bipolar disorder, borderline intellectual functioning, hepatitis C, and obesity. *Id.* He found that other alleged impairments were non-severe, and he found that her PTSD was a medically non-determinable impairment. *Id.* At Step Three, the ALJ found that Ogburn's impairments did not meet a Listing. (R. 13-14).

The ALJ determined that Ogburn had the RFC to do the full range of light work with the additional limitation that she was "able to perform simple repetitive tasks and have incidental contact with the public." (R. 15). At Step Four, the ALJ found that Ogburn had no past relevant work. (R. 18). At Step Five, the ALJ found that there were jobs that Ogburn could perform, taking into account her age, education, work experience, and RFC. (R. 18-19). Therefore, the ALJ found that Ogburn was not disabled at any time from the application date of September 13, 2005, through the date of his decision. (R. 19).

**Review**

While Ogburn raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the Mental Status Form completed by a physician and a case manager at FCS. Because reversal is required on this issue, the other issues Ogburn raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician

opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

The ALJ's discussion of the Mental Status Form lacked clarity. First, the ALJ stated that "[c]onsideration was given to the claimant's therapist, where [sic] it was opined the claimant was able to remember, comprehend and carry out simple instructions with assistance." (R. 17). The ALJ cited to Exhibit 9F, which was the Mental Status Form signed by an FCS physician and case manager. (R. 450). The ALJ's statement, however, omitted the next sentence on the form: "[Ogburn is] unable to respond to work pressure." *Id.*

Thus, the ALJ's first error regarding the Mental Status Form was that his discussion of the form was not as complete as it should have been. The opinion that Ogburn was unable to respond to work pressure supported her claim of disability, and the ALJ needed to include this point in his discussion. *See Robinson*, 366 F.3d at 1083 (An ALJ is "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability"); *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) ("in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects"). It is error to ignore evidence that would support a

finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007).

After his partial recitation of the opinions contained on the Mental Status Form, the ALJ recited the requirements regarding treating physician opinion evidence, including the factors that an ALJ must consider. (R. 17-18). In the next sentence, however, the ALJ stated that the limitations "were given by a therapist and not a medical doctor." (R. 18). This was the second error of the ALJ, because the form was definitely signed by an FCS physician. (R. 450). While the signature is not legible, it bears some resemblance to the signatures of Dr. Stephen Harnish in the record. [6] Additionally, the case manager who signed the Mental Status Form wrote in her case notes that she had assisted Ogburn in filling out the Mental Status Form and in obtaining a doctor's signature on the form. (R. 387). Thus, the ALJ was factually incorrect in stating that the form was signed by a therapist instead of a medical doctor, when in reality it was signed by both a physician and a case manager.[7]

---

[6]For example, pages 824-25 of the administrative transcript are computer records of FCS showing that Dr. Harnish was the prescribing physician for Ogburn's medications in 2006 and part of 2007. Pages 826-27 then provide signatures for prescriptions on certain dates in 2006 and 2007, and several of those signatures appear to be those of Dr. Harnish, and they are similar to the physician's signature on the Mental Status Form.

[7]The undersigned agrees with Ogburn that even if the Mental Status Form was an "other source" opinion instead of a treating physician opinion, the ALJ's discussion would not have been adequate. In *Frantz*, the Tenth Circuit found that the ALJ did not properly consider opinion evidence from a clinical nurse specialist who had indicated that the claimant could not work due to numerous symptoms of her mental illness. *Frantz*, 509 F.3d at 1300-01. The ALJ had an obligation to discuss this "other source" evidence and to explain the weight given to it. *Id.* The undersigned agrees with Ogburn that the ALJ's statement that he had considered the Mental Status Form and that it "cannot be given probative weight" was not an adequate discussion. (R. 18). The ALJ gave no reason for this statement other than that the limitations were given by a licensed social worker rather than by a medical doctor. *Id.* This reason would not have been adequate even if the form had been "other source" opinion evidence.

12

Because the ALJ incorrectly found that the Mental Status Form was not treating physician opinion evidence, he did not consider the form under the proper criteria for treating physician opinion evidence as the Court has set forth above and as the ALJ himself set out in his decision. The ALJ's decision must be reversed so that the ALJ can properly consider this treating physician opinion evidence.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Ogburn. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Ogburn.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 29th day of June, 2011.

_____
Paul J. Cleary
United States Magistrate Judge